230 N.J. Super. 63 (1989)
552 A.2d 649
ARONSOHN & SPRINGSTEAD AND RICHARD F. ARONSOHN, PLAINTIFFS-RESPONDENTS, CROSS-APPELLANTS,
v.
JONAS WEISSMAN, DEFENDANT-APPELLANT, CROSS-RESPONDENT.
Superior Court of New Jersey, Appellate Division.
Argued January 4, 1989.
Decided January 19, 1989.
*64 Before Judges PRESSLER, O'BRIEN and SCALERA.
Jack Jay Wind argued the cause for appellant, cross-respondent (Margulies, Wind, Herrington & Katz, attorneys, Jack Jay Wind, on the brief).
Richard H. Weiner argued the cause for respondents, cross-appellants (Aronsohn, Springstead & Weiner, attorneys, Richard F. Aronsohn and Mark S. Paige, on the brief).
The opinion of the court was delivered by PRESSLER, P.J.A.D.
The issue of first impression raised by this appeal is whether a so-called Keogh retirement plan maintained by a self-employed professional for his own exclusive account may be levied upon by a judgment creditor under a writ of execution. The trial judge, concluding that such an account is not exempt from *65 execution, issued a turnover order requiring the depository bank to transfer to the Sheriff funds from such an account sufficient to pay the judgment. The judgment debtor appeals, and we affirm.
Plaintiff Aronsohn and Springstead is a law firm in Bergen County. Plaintiff Richard H. Aronsohn, a partner in the firm, represented defendant Jonas Weissman, a physician, in marital litigation. Weissman was dissatisfied with Aronsohn's bill for legal services, and this dispute was ultimately arbitrated by a District Fee Arbitration Committee pursuant to R. 1:20A. The Committee issued its written determination on March 21, 1988 finding that Aronsohn was entitled to $18,081.60, the full amount of the balance due on his final bill. That determination was reduced to judgment on May 20, 1988. Aronsohn thereafter obtained a writ of attachment authorizing the Bergen County Sheriff to attach Weissman's property, and on June 14, 1988, the Sheriff reported his attachment of "all the right, title and interest of the defendant, Jonas Weissman, in and to monies of the aforementioned defendant in a Keogh Account Number XX-XXXXXX," in the amount of $18,081.60, located at Columbia Savings & Loan Association, in Fair Lawn. The total amount of the account is about $175,000. On notice to defendant and the bank, a writ of execution issued, and following a hearing on the return date of an order to show cause, the turnover order here appealed from was entered.
The only issue before the trial court and before us is whether a qualified "Keogh"[1] account is subject to execution by a judgment creditor. Defendant argues that it is immunized from execution by the Internal Revenue Code (Code) and, more particularly, 26 U.S.C.A. § 401(a)(13)(A), which conditions qualification *66 of a retirement trust for the favorable income tax treatment afforded by the Code upon the plan's express provision that the benefits provided thereby "may not be assigned or alienated." Defendant also relies on the implementing regulation, 26 C.F.R. § 1.401(a)-13(b)(1), which further provides that the trust will not be qualified unless the plan stipulates "that benefits provided under the plan may not be anticipated, assigned (either at law or in equity), alienated or subject to attachment, garnishment, levy, execution or other legal or equitable process."
Defendant's thesis is further predicated on the Employee Retirement Income Security Act of 1974 (ERISA), 29 U.S.C.A. § 1001, et seq., enacted to regulate and protect welfare and pension plans created and maintained by employers or employee associations for the benefit of employees. ERISA, he argues, by reason of 29 U.S.C.A. § 1056(d)(1), which is virtually identical in verbiage to 26 U.S.C.A. § 401(a)(13)(A), clearly insulates an employee's interest in a retirement plan from creditors. See, e.g., Helmsley-Spear, Inc. v. Winter, 74 A.D.2d 195, 426 N.Y.S.2d 778 (1980), aff'd o.b. 52 N.Y.2d 984, 438 N.Y.S.2d 79, 419 N.E.2d 1078 (Ct.App. 1980). And see Mackey v. Lanier Collections Agency, 486 U.S. ___, 108 S.Ct. 2182, 100 L.Ed.2d 836 (1988). He contends that the anti-alienation language of 26 U.S.C.A. § 401(a)(13)(A) should be accorded the same exemption consequence in respect of the self-settled "Keogh" trusts of self-employed persons. He further points out that a breach of the anti-alienation provisions of the Code and implementing regulation which might be affected by execution on his Keogh account would result in its disqualification for favorable tax treatment and the imposition upon him pursuant to the Code of the consequent burden of the tax penalties therein provided.[2] *67 Congressional policy, he argues, would be violated by such disparate treatment of beneficiaries of employer-created plans and beneficiaries of self-settled plans.
We disagree. We start from the premise that the Internal Revenue Code, and particularly 26 U.S.C.A. § 401(a)(13)(A), speaks only to the federal income tax consequences of premature alienation of a Keogh trust. Thus, the Code does not forbid involuntary alienation by execution under state law but only provides for the tax consequences thereof. The question then, as we see it, is essentially one of basic trust law and the only effect of the Code is whether those consequences are of sufficient moment to require a contrary result.
The self-employed person's qualified Keogh plan is, in effect, a self-settled trust in which the funds are provided by the settlor, who retains control over their management and who is exclusively entitled thereto. He is also free to terminate the trust and to withdraw the accumulated funds at any time subject only to payment of a tax penalty if he does so prior to the retirement age stipulated in the plan.[3]See, e.g., Rayndon and Anderson, "Attachment of Keogh Plan Assets  A Confusion in the Law and the Courts," 61 Taxes 525 (1983). These characteristics of a Keogh trust are, of course, in complete contradistinction to an ERISA retirement plan created by a separate employer or employee association for the benefit of employees. See, e.g., Hebert v. Fliegel, 813 F.2d 999, 1001 (9th Cir.1987), distinguishing between the two as follows:
The latter [employer-granted plans] are funded and controlled by the employer, and carry with them well-defined, employer-determined guidelines on when an employee's interest in the funds vests and when such funds may be withdrawn. *68 Keogh plans, on the other hand, are funded exclusively by the self-employed individual, who retains complete control over the amounts invested and the management of the funds. This individual also retains the right to terminate the plan and withdraw the funds at any time, subject only to a tax penalty. [footnote omitted]
Clearly then, in respect of the employer-granted plan, the employee beneficiary has no right of unilateral "premature" access, penalty or not. The self-settlor of a Keogh plan does.
The deferred-benefit character of both Keogh and employer-granted plans coupled with their anti-alienation stipulations endow both with the essential attributes of a spendthrift trust. See, generally, Rayndon and Anderson, supra, 530-531. And see, defining the spendthrift trust, 1 Restatement 2d, Trusts, § 152(2), 311 (1959), providing that "a trust in which by the terms of the trust or by statute a valid restraint on the voluntary and involuntary transfer of the interest of the beneficiary is imposed is a spendthrift trust." While the restraint on involuntary alienation of a spendthrift trust is generally valid, defeating the right of creditors of the beneficiaries thereto, it is uniformly recognized as a matter of both common and statutory law that the self-settled spendthrift trust is not entitled to that protection. Thus, the Restatement rule is that
Where a person creates for his own benefit a trust with a provision restraining the voluntary or involuntary transfer of his interest, his transferee or creditors can reach his interest. [Restatement, supra, § 156(1) at 326]
And see 2 Scott, Trusts, § 156 at 1190-1191 (3d ed. 1967); Bogert, Trusts, § 223 at 438-439 (2d ed. 1979). While this principle has not apparently been addressed by any reported case in this jurisdiction, it is nevertheless a matter of legislative recognition. Thus, N.J.S.A. 3B:11-1, formerly N.J.S.A. 3A:42-1, provides that
The right of any creator of a trust to receive either the income or the principal of the trust or any part of either thereof, presently or in the future, shall be freely alienable and shall be subject to the claims of his creditors, notwithstanding any provision to the contrary in the terms of the trust.
And N.J.S.A. 2A:17-57, et seq., directly addressing the rights of execution creditors, expressly authorizes execution against the debtor's self-settled trust. And finally, N.J.S.A. 25:2-1 provides *69 that a self-settled trust "shall be void as against [the settlor's] creditors." Thus, as Rayndon and Anderson, supra, at 530-531, conclude, a Keogh plan is clearly, in essence, a self-settled spendthrift trust  reachable by the settlor-beneficiary's creditors. As they explain,
In other words, the employer who created the plan is also a beneficiary of the plan. Statutes and cases in the law of trusts have repeatedly held that a spendthrift trust created by the settlor and which names him or her as sole beneficiary of the trust res is void as against present and future creditors. Those creditors may reach the funds held in trust in order to satisfy their claims against the beneficiary. Creditors of the sole beneficiary of a self-settled spendthrift trust may satisfy their claims against the beneficiary from the principal and income of the trust fund because it is against public policy to permit a person to tie up property in such a way that he can enjoy it but prevent creditors from reaching it. [Ibid.]
The essential nature of the Keogh plan as a self-settled spendthrift trust has impelled the courts of New York, the only jurisdiction in which the issue has apparently been directly raised, to conclude that such plans are subject to execution by general creditors even though employer-granted plans protected by ERISA are not.[4]See Lerner v. Williamsburg Savings Bank, 87 Misc.2d 685, 386 N.Y.S.2d 906, 909 (Civ.Ct. 1976), noting that
All that the [Keogh] statute does is defer payment of taxes on profits of the partnership. The monies, however, belong to the partners individually in proportion to their interest in those partnership profits  in this case 20%. Certainly if these were profits to be distributed and paid to Dr. Lerner they would be subject to attachment and the rights of creditors could not be defeated. To permit the creation of a trust fund into which these profits were paid, (attachable if distributed) to remain free from attachment would create a travesty upon justice.
*70 See also Abrahams v. New York State Tax Com'n, 131 Misc.2d 594, 500 N.Y.S.2d 965 (Sup.Ct. 1986); Sheehan v. Sheehan, 90 Misc.2d 673, 395 N.Y.S.2d 596 (Sup.Ct. 1977).
The federal courts have similarly concluded in considering whether Keogh plans are exempt from creditors in bankruptcy actions pursuant either to 11 U.S.C.A. § 522(b), which permits the debtor to opt for the state rather than the federal exemption system, or pursuant to 11 U.S.C.A. § 541(c)(2), which exempts the debtor's beneficial interest in a trust if a restriction on its transfer is enforceable "under applicable non-bankruptcy law." The Fifth Circuit Court of Appeals, in Matter of Goff, 706 F.2d 574 (5th Cir.1983), held that § 541(c)(2) incorporates state spendthrift trust law, not the anti-alienation provisions of ERISA or the Internal Revenue Code and, hence, that Keogh plans constitute part of the bankrupt's estate available for the benefit of his creditors. The court reasoned that
ERISA merely provides that as a condition of obtaining qualified status  with its attendant tax and other benefits  a pension plan must preclude alienation or assignment of its benefits. It does not prohibit pension funds from permitting alienation or assignment; rather, while it encourages and favors qualified plans, it envisions that "disqualified" plans may be formed which are still subject to ERISA's regulatory scheme but which do not restrict alienation or assignment. [706 F.2d at 585]
It concluded not only that Keogh plans come within the general definitional character and consequence of a spendthrift trust, but also that public policy demands the availability to creditors of such funds. Noting the "strong policy that will prevent any person from placing his property in what amounts to a revocable trust for his own benefit which would be exempt from the claims of his creditors," the court explained that
appellant-debtors attempted such a revokable trust for their own benefit. They retained the freedom to withdraw their Keogh plan assets, yet purported to insulate those assets from their creditors. If this dichotomous treatment were to be recognized, the strong common law policy of spendthrift trusts, as well as the Bankruptcy Code's intent, would be subverted. Debtors could shelter funds in Keogh plans immediately before declaring bankruptcy  as did the Goffs with at least some of their funds  and immediately after discharge of all debts withdraw such funds for their own benefit. Whatever might be the rule in a nonbankruptcy setting involving ERISA's provisions we hold that neither law *71 nor equity would afford self-settled Keogh plans "spendthrift trust" exemption in bankruptcy. [Id. at 588; footnotes omitted]
See also Matter of Witlin, 640 F.2d 661 (5th Cir.1981); Hebert v. Fliegel, supra, 813 F.2d 999.
Defendant's final argument is that it is essentially unfair for employer-created pension trusts and self-settled Keogh trusts to be disparately treated and that such disparate treatment violates Congressional policy of treating all retirement plans similarly and protecting all such plans in the interests of the retiree and his family.[5] We reject this contention, finding both persuasive and applicable the reasoning in Goff which led that court to reject similar claims. As the Ninth Circuit there observed:
In analyzing the effectiveness in bankruptcy of spendthrift provisions in pension plans, the courts have generally concluded that those contained in employer-created plans were effective [but] similar provisions in self-settled plans were not. The latter conclusion is inescapable since, as discussed earlier, the traditional law of spendthrift trusts has rejected the notion of effective spendthrift provisions in self-settled trusts. As to the former, without passing upon the exact limits of plans which could properly be characterized "spendthrift trusts," the employer-created-and-controlled nature of those plans may well make them analogous to a spendthrift trust.
We find that this difference is contrary to neither law nor logic. First, whether or not ERISA bestows equal treatment upon both types of plans is not at issue. As discussed previously, ERISA was not intended to affect the operation of other federal laws including federal bankruptcy laws. If a distinction is created by operation of bankruptcy law, which might conflict with ERISA, bankruptcy law prevails. Even assuming arguendo that the courtdrawn distinction conflicts with federal pension law, it is nonetheless enforceable if valid under federal bankruptcy law.
Second, we disagree with appellants' characterization that the degree of beneficiary control over both types of pension plans is indistinguishable, thus rendering their separate treatment unreasonable. Under appellants' self-employed Keogh plans considerable control, including withdrawal authority, was *72 retained. The only limitation upon withdrawal was a ten percent tax penalty. We find this to be significantly different from the usual case of employer-created funds in which the beneficiary employee has little or no control during the term of his employment, and may only withdraw funds upon termination of employment. He must quit his job in order to gain premature access to his retirement funds. We cannot equate a "tax penalty" with "employment termination" as equal restraints upon withdrawal of pension funds. [706 F.2d at 589; footnotes omitted]
Finally, we note that the turnover order originally entered here gave defendant a ten-day period in which to pay the judgment with other funds in order to keep his Keogh account intact. We regard that provision as adequately protective of his legitimate rights and expectations.
The order appealed from is affirmed. Defendant shall, however, have ten days from the date hereof to pay the judgment out of other funds, and execution of the turnover order shall be stayed for that period of time. In the event he does so, the turnover order shall be vacated. If he does not, it shall be accorded full force and effect.
NOTES
[1] The "Keogh" terminology derives from Keogh-Smothers Act (Self-Employed Individuals Tax Retirement Act of 1962) by which self-employed retirement plans eligible for tax deferral treatment was first authorized, commonly known as H.R. 10. See P.L. No. 87-792, 76 Stat. 809 (1962). These plans are now encompassed by 26 U.S.C.A. § 401, et seq.
[2] Although not raised, we note that this consequence may not in fact attach since Article 9.10 of defendant's prototype plan permits, under specified circumstances, a "hardship" withdrawal of funds, hardship being defined as including "a judgment or other extraordinary liability exceeding 10% of the Participant's federal taxable income for the prior year."
[3] In terms of unilateral premature access, the penalty consequence of revocation has been held not to constitute a "significant restraint" on the exercise of the right of early withdrawal. See Hebert v. Fliegel, infra, 813 F.2d at 1001, n. 3.
[4] We need not address here the 1984 enactment of the so-called Retirement Equity Act (REA), P.L. 98-397, 98 Stat. 1426, which amended 26 U.S.C.A. § 401(a)(13)(A) by the addition of subparagraph (B), which excepts qualified domestic relations orders from the non-alienation provisions of the Code. Cf. Biles v. Biles, 163 N.J. Super. 49 (Ch.Div. 1978); Ward v. Ward, 164 N.J. Super. 354 (Ch.Div. 1978). And see Mallory v. Mallory, 179 N.J. Super. 556 (Ch.Div. 1981).
[5] Defendant relies for this proposition on legislative history attending the adoption of ERISA, the Tax Equity and Fiscal Responsibility Act of 1982 (TEFRA) and REA, which support the congressional purpose of encouraging a strong private pension system through tax incentives and general elimination of relevant distinction between employer-granted and Keogh plans. See, U.S.Code Congressional and Administrative News, 97th Congress, 2d Session 1982 at 1055, 1393; 98th Congress, 2d Session, 2547.