38 A.3d 611

CHARLES CAMERON AND CHRISTINE CAMERON,
HIS WIFE, PLAINTIFFS–APPELLANTS, v. ROY
B. EWING, DEFENDANT–RESPONDENT.

Superior Court of New Jersey
Appellate Division

Submitted December 7, 2011—Decided March 8, 2012.

Before Judges AXELRAD, SAPP–PETERSON and OSTRER.

*Pellettieri, Rabstein & Altman,* attorneys for appellants (*W. Barry Rank,* on the briefs).

*Shimberg & Friel, P.C.,* attorneys for respondent Wells Fargo Bank, N.A. (*Anne E. Walters,* on the brief).

Respondent Roy B. Ewing has not filed a brief.

The opinion of the court was delivered by

OSTRER, J.S.C. (temporarily assigned).

This appeal presents the novel issue whether the stream of payments due a homeowner under a home equity conversion mortgage, also known as a reverse mortgage, is subject to execution and garnishment for the benefit of judgment creditors of the homeowner. The trial court determined the payments were beyond the reach of the judgment creditors, and denied their motion to compel the mortgagee to comply with a writ of execution. We reverse, reasoning the mortgagee's obligation to make monthly payments to defendant, the judgment debtor, is properly construed to be a "debt" against which plaintiffs, the judgment creditors, may obtain an order directing execution and garnishment under *N.J.S.A.* 2A:17–50 and –63 and *Rule* 4:59–1(c). We remand for the court to determine the percentage of the debt properly subject to execution. *N.J.S.A.* 2A:17–56.

## I.

The facts are undisputed. Plaintiffs filed a complaint in July 2007 against defendant seeking damages arising out of an automobile accident. Defendant was an uninsured driver. He sought a trial de novo after an unfavorable arbitration award, but the case settled after a pre-trial conference. Defendant consented to entry of judgment against him for $400,000 on April 16, 2009.

Two months before settling the case, defendant entered into the reverse mortgage with Wells Fargo Bank, N.A. (Wells Fargo).

Defendant, then almost eighty-five years old, gave Wells Fargo, a mortgage on his Lambertville house in an amount "up to" $360,000. Although we will analyze the terms of the transaction in greater detail below, suffice it to say here that Wells Fargo agreed to pay defendant $959.01 for as long as he lived and resided in his house.

Plaintiffs discovered the existence of the mortgage in the course of post-judgment supplementary discovery. Defendant's other income consisted of monthly Social Security benefits and a modest Pennsylvania public employee pension. On plaintiffs' behalf, the Hunterdon County Sheriff served a writ of execution dated June 1, 2010, on Wells Fargo, levying against "monies due to defendant from a reverse mortgage from Wells Fargo Home Mortgage." After Wells Fargo refused to comply, plaintiffs filed a motion in aid of litigants' rights on November 23, 2010, seeking an order compelling Wells Fargo to withhold the monies due defendant under the reverse mortgage and pay them over to the sheriff.

Plaintiffs argued Wells Fargo's obligation to pay defendant $959 a month was a "debt due," and therefore subject to garnishment under *N.J.S.A.* 2A:17-63. Alternatively, plaintiffs argued they were entitled to an order compelling defendant, as judgment debtor, to pay over his reverse mortgage receipts in regular installments, pursuant to *N.J.S.A.* 2A:17-64. Wells Fargo argued its monthly payments to defendant should not be deemed property subject to garnishment under *Rule* 4:59-1.

In a written decision dated March 4, 2011, the court agreed the regular payments from Wells Fargo to defendant were not subject to garnishment under *N.J.S.A.* 2A:17-63, nor to an order for installment payments under *N.J.S.A.* 2A:17-64. The court reasoned the reverse mortgage payments to defendant were properly characterized as loans from Wells Fargo to defendant, secured by the mortgage on the house, and repayable upon defendant's death or other events described in the transactional documents. Thus, Wells Fargo was not indebted to defendant; rather, defendant was indebted to Wells Fargo.

The court rejected plaintiffs' arguments that the reverse mortgage payments should be subject to execution because it was simply a means of "freeing up" defendant's interest in the equity of the home; or, alternatively, the payments were, in substance, a form of an annuity that should be subject to execution. The court also held that because Wells Fargo's payments to defendant were loans subject to repayment, they did not constitute "income" subject to an installment order under *N.J.S.A.* 2A:17–64.

On appeal, plaintiffs argue:

POINT ONE

THE MONTHLY PAYMENTS UNDER THE MORTGAGE TERMS OF THE REVERSE MORTGAGE ARE SUBJECT TO A WRIT OF EXECUTION.

POINT TWO

PURSUANT TO *N.J.S.A.* 2A:17–64 THE COURT SHOULD ORDER THE DEFENDANT TO MAKE MONTHLY PAYMENTS TO THE PLAINTIFFS.

## II.

As this appeal presents an issue of law, our review is de novo. *Manalapan Realty, L.P. v. Manalapan Twp. Comm.,* 140 *N.J.* 366, 378, 658 *A.*2d 1230 (1995) ("A trial court's interpretation of the law and the legal consequences that flow from established facts are not entitled to any special deference."). The issue presented is whether Wells Fargo's monthly payment obligation under the reverse mortgage constitutes a "debt" subject to execution and garnishment. To answer this question, we consider the terms of the reverse mortgage, and then construe the execution statute in light of relevant case law and governing public policy.

## A.

The reverse mortgage transaction is embodied in four principal documents: Home Equity Conversion Loan Agreement (Loan Agreement), Adjustable Rate Home Equity Conversion Mortgage (Mortgage), Home Equity Conversion Mortgage Payment Plan

(Payment Plan), and Note.[1] The Mortgage secured repayment of the debt evidenced by the Note, up to a principal amount of $360,000, at a variable interest rate initially set at 4.79 percent, subject to a 14.75 percent cap. The rate was expected to average 5.17 percent according to the Payment Plan.

Pursuant to the Payment Plan, defendant opted to receive, and Wells Fargo agreed to pay defendant $959 a month during his tenure in the house. The Payment Plan provided a "Principal Limit" for those payments of $116,633. Monthly payments under the "tenure plan" that defendant selected, as opposed to a "term payment plan," were still based on a projected term, and provided for monthly payments calculated to equal the Principal Limit when defendant reached 100 years of age.[2] Wells Fargo was liable for a late charge of ten percent of the monthly payment if it forwarded it to defendant late. The Loan Agreement provided that Wells Fargo would withhold from defendant's monthly payment amounts to cover property taxes and insurance. In addition to the monthly payments, defendant at closing received $20,000 as a cash advance, plus retained an additional line of credit of $15,000. Wells Fargo retained funds to cover servicing fees, the discharge of liens of almost $26,000, and closing costs of over $15,000, which included a $4800 fee to the FHA and a $4400 loan origination fee.

Defendant promised that all funds advanced would be repaid upon his death.[3] He agreed to reside in the house and to maintain

---

[1] The note was not included in the record before us.

[2] We are unable to reconcile the provision of the "tenure payment plan" in the Loan Agreement, which apparently provided defendant payments for almost sixteen years, given his age of 84 years when he entered the transaction; and the Payment Plan, which set the monthly payment at a level where he would exceed the Principal Limit in just over ten years ($116,633/$959=121.6). However, defendant was permitted to change from the "tenure payment plan" to the "term payment plan" whenever the Principal Balance was less than the Principal Limit.

[3] Defendant did not execute a Shared Appreciation Rider, which would have granted Wells Fargo a partial interest in any appreciation in the value of

it. Wells Fargo was authorized to accelerate the debt and require full payment of all funds secured by the Mortgage if defendant died, no longer lived in the house as his principal residence, or breached another obligation of the Mortgage. The payment obligation also ceased if defendant filed a petition in bankruptcy. The Loan Agreement and Mortgage include severability clauses, providing that if any provision conflicted with State or federal law, it shall be severed from the balance of the agreement which shall be given effect.

The debt secured by the Mortgage is non-recourse. Thus, defendant has no personal liability for repayment. Wells Fargo is barred from obtaining a deficiency judgment, and is limited to enforcing the debt through the sale of the property.

### B.

A judgment creditor is entitled to obtain execution against a debtor's "debts" as well as earned income, trust fund income, and profits.

> When a judgment has been recovered in the Superior Court, and where any wages, *debts*, earnings, salary, income from trust funds, or profits are due and owing to the judgment debtor, or thereafter become due and owing to him, to the amount of $ 48.00 or more a week, the judgment creditor may, on notice to the judgment debtor unless the court otherwise orders, apply to the court in which the judgment was recovered, or to the court having jurisdiction of the same, and upon satisfactory proofs, by affidavit or otherwise, of such facts, the court shall grant an order directing that an execution issue against the wages, *debts*, earnings, salary, income from trust funds, or profits of the judgment debtor.

[*N.J.S.A.* 2A:17–50 (emphasis added).]

---

defendant's property upon sale. *See* 24 *C.F.R.* 206.23 (under optional shared appreciation provision, "the mortgagor shall pay an additional amount of interest equal to a percentage of any net appreciated value of the property during the life of the mortgage. The percentage of net appreciated value to be paid to the mortgagee, referred to as the appreciation margin, shall be no more than twenty-five percent, subject to an effective interest rate cap of no more than twenty percent."). We therefore assume defendant retained sole interest in any appreciation of the property exceeding his indebtedness.

*See also* R. 4:59–1(d) (regarding "issuance of an execution against wages, *debts*, earnings, salary, income from trust funds or profits") (emphasis added).

In the case of regular, recurring payments, the creditor is entitled to a garnishment order.

> After a levy upon a *debt* due or accruing to the judgment debtor from a third person, herein called the garnishee, the court may upon notice to the garnishee and the judgment debtor, and if the garnishee admits the debt, direct the debt, to an amount not exceeding the sum sufficient to satisfy the execution, to be paid to the officer holding the execution or to the receiver appointed by the court, either in 1 payment or in installments as the court may deem just.
>
> [*N.J.S.A.* 2A:17–63 (emphasis added).]

■ Construing the term "debt" in the execution statute, our former Supreme Court held that "debt" should be accorded not only its ordinary legal meaning as "an obligation for the payment of money founded upon a contract, express or implied," but more broadly as "that which one person is bound to pay to another under any form of obligation." *Passaic Nat'l Bank & Trust Co. v. Eelman,* 116 *N.J.L.* 279, 281, 183 *A.* 677 (Sup.Ct.1936). "Whatever the law enjoins one to pay takes the legal classification of a debt." *Id.* at 282, 183 *A.* 677. The court in *Passaic Nat'l Bank* determined that a "debt" encompassed a municipal police officer's pension that was not otherwise expressly exempted from execution.

■ The court held that "debt" should be interpreted in light of the Legislature's apparent intent in enacting the law on execution. The meaning "may be enlarged or restricted to effectuate the manifest reason and obvious purpose of the law." *Id.* at 283, 183 *A.* 677. The court concluded that the Legislature intended to subject to execution not only earned income, but also other installment obligations.

> Evidently, the legislative purpose was to include all obligations that, like wages and salaries, income from trust funds, and profits, are payable in periodic installments or stated sums at not less than the prescribed minimum rate. It was patently not the intention to limit the operation of the statute strictly to contractual obligations to pay for the judgment debtor's labor or personal service.
>
> [*Ibid.*]

*See also T. & C. Leasing, Inc. v. Wachovia Bank, N.A.*, 421 *N.J.Super.* 221, 228, 23 *A.*3d 440 (App.Div.2011) (stating executions under *N.J.S.A.* 2A:17–50 pertain generally to regularly recurring payments to the judgment debtor).

■ Consistent with these principles, the monthly reverse mortgage payments due from Wells Fargo are properly deemed debts owing to defendant. Federal law defines the Home Equity Conversion Mortgage to mean "a first mortgage which provides for future payments to the homeowner based on accumulated equity[.]" 12 *U.S.C.* § 1715z–20(b)(3). The recognized purpose of the transaction, reflected by its name, Home Equity Conversion Mortgage, is "to permit the conversion of a portion of accumulated home equity into liquid assets[.]" 12 *U.S.C.* § 1715z–20(a)(1).[4] Our state's law authorizing issuance of reverse mortgages characterizes the payments to the mortgagor as "income," although it exempts it from taxation as gross income. *N.J.S.A.* 46:10B–20. *See also Assembly Banking and Insurance Committee Statement to A.1660* (1979) (stating that reverse mortgages, as authorized by *L.* 1979, *c.* 140, and codified at *N.J.S.A.* 46:10B–16 to –21, "permit[ ] senior citizens to make use of the equity which they have built up in their home.... The senior citizen would ... have his income supplemented while still being able to live in his home.").[5]

Although the payments are not earned income, they are a regular and recurring obligation of Wells Fargo. It is of no moment that defendant also is indebted to Wells Fargo and he or his estate is ultimately liable to repay the monies received to the extent repayment may be generated from sale of the property. Wells Fargo remains obliged to make periodic installment pay-

---

[4] Regulations governing federally insured Home Equity Conversion Mortgages are set forth at 24 *C.F.R.* Part 206.

[5] Although the Legislature expressly provided that reverse mortgage proceeds were exempt from taxation as gross income, *N.J.S.A.* 46:10B–20, the Legislature was silent on whether the proceeds were exempt from execution or garnishment.

ments to defendant pursuant to the terms of its Loan Agreement and Mortgage.

We recognize that "[a] debt which is uncertain and contingent, in the sense that it may never become payable, is not subject to levy and sale." *Cohen v. Cohen,* 126 *N.J.L.* 605, 610, 20 *A.*2d 594 (Sup.Ct.1941) (holding widow's right to collect one third of death benefit under husband's life insurance policy if she were alive on a date certain in the future was too uncertain and speculative to be subject to levy and sale under execution law). However, debts may be subject to execution "if liquidated and certain in their existence[.]" *Canger v. Froysland,* 283 *N.J.Super.* 615, 621, 662 *A.*2d 1034 (Ch.Div.1994). *See also Passaic Nat'l Bank & Trust Co., supra,* 116 *N.J.L.* at 282, 183 *A.* 677 (stating that a debt must be "for a sum certain, or a sum readily reducible to a certainty," that may be payable in a single amount, or in installments). In this case, Wells Fargo's payment obligation is certain and currently payable.

Reading "debt" to include Wells Fargo's monthly payment obligation to defendant is also consistent with the general policy favoring enforcement of judgments. "It is the general policy of the law to lend the creditor all reasonable assistance for the enforcement of his claim, especially against a debtor who, though possessed of the means to pay, seeks to evade his obligation." *Id.* at 286, 183 *A.* 677.

Nor is execution barred by defendant's agreement not to assign his rights under the Loan Agreement and Mortgage. Execution and garnishment do not depend on defendant personally assigning his rights. Also, the non-assignment covenant is ineffective to bar execution and garnishment notwithstanding the oft-stated general rule that a test of liability to garnishment or execution "is whether it is the subject of assignment." *Id.* at 286, 183 *A.* 677. *See also Seventy–First Street and Broadway Corp. v. Thorne,* 10 *N.J. Misc.* 99, 104, 157 *A.* 851 (Sup.Ct.1932)(applying rule to shield pension payments from garnishment); *Sears, Roe-*

*buck & Co. v. Romano,* 196 *N.J.Super.* 229, 236–37, 482 *A.*2d 50 (Law Div.1984) (applying rule as alternative basis to shield from execution unexercised overdraft privileges). *But see Otten v. Cavalli,* 14 *N.J. Misc.* 296, 296–97, 184 *A.* 442 (C.P.1936) (distinguishing *Seventy-First Street and Broadway Corp., supra,* and *Passaic Nat'l Bank & Trust Co., supra,* stating "it is the inherent nature of the claim itself, and not any peculiar inter-party restrictions" that governs whether garnishment is permitted). Absent a statutory exemption or other clear countervailing public policy, the non-assignability rule does not extend so far that it shields from execution and garnishment payments from a source the judgment debtor created.

▮ We thus treat the non-assignment clause as we have treated restrictions on alienation in self-settled spendthrift trusts. " 'Where a person creates for his own benefit a trust with a provision restricting the voluntary or involuntary transfer of his interest, his transferee or creditors can reach his interest.' " *Aronsohn & Springstead v. Weissman,* 230 *N.J.Super.* 63, 68, 552 *A.*2d 649 (App.Div.1989) (quoting *Restatement (Second) on Trusts,* § 156(1) (1959)). *See also N.J.S.A.* 25:2–1(a) (except as provided, "every conveyance, transfer and assignment of goods, chattels or things in action, made in trust for the use of the person making the same, shall be void as against creditors").

In *Aronsohn & Springstead, supra,* 230 *N.J.Super.* at 67–68, 552 *A.*2d 649, we extended that principle to a Keogh account, notwithstanding the anti-alienation provision of federal law, 26 *U.S.C.* § 401(a)(13)(A). We found the anti-alienation provision did not forbid involuntary alienation by execution under state law, as the provision only provided for negative tax consequences if alienation occurred. *Id.* at 67, 552 *A.*2d 649. We are unaware of any federal or state law or regulation that expressly limits assignment or execution against the payments under a Home Equity Conversion Mortgage, nor have the parties cited one to us.

▮ The same public policy that impelled our decision in *Aronsohn & Springstead* applies here. Denying plaintiffs relief

would allow defendant to continue to enjoy all the benefits of owning a home, while placing even the monthly payments generated thereby beyond the reach of his creditors. " 'Creditors of the sole beneficiary of a self-settled spendthrift trust may satisfy their claims against the beneficiary ... because it is against public policy to permit a person to tie up property in such a way that he can enjoy it but prevent creditors from reaching it.' " *Id.* at 69, 552 *A.*2d 649 (quoting Rayndon & Anderson, "Attachment of Keogh Plan Assets–A Confusion in the Law and the Courts," 61 *Taxes* 525, 530–31 (1983)).

While we have found no published opinion specifically addressing whether a reverse mortgage's payment stream is subject to execution and garnishment, we find support for our conclusion in a federal appeals court's decision that a line of credit is subject to execution on behalf of judgment creditors once the credit line is exercised. *In re Southwestern Glass Co.,* 332 *F.*3d 513, 518 (8th Cir.2003) (judgment creditor entitled to writ of garnishment against bank holding proceeds of advances against judgment debtor's line of credit); *cf. Sears, Roebuck & Co. v. Romano, supra,* 196 *N.J.Super.* at 236, 482 *A.*2d 50 (overdraft privileges not subject to garnishment where no debtor-creditor relationship had yet been created by a draft on the account). The monthly payments under defendant's reverse mortgage has some attributes of an exercised line of credit. Just as the recipient of a line of credit is indebted to the financial institution extending it, defendant is indebted to Wells Fargo as he receives payments, drawing down credit against his overall payment limit. Nonetheless, the financial institution that has agreed to provide its customer a line of credit is obligated to honor drafts against the line, making the financial institution indebted to its customer, and subjecting to execution the exercised line of credit. Likewise, the monthly payments Wells Fargo is obligated to make are subject to execution.

We also find unpersuasive Wells Fargo's argument that its payment obligation to defendant should not be subject to execu-

tion and garnishment because defendant is obliged to repay the amounts advanced to him. As we have observed, defendant may be indebted to Wells Fargo at the same time Wells Fargo is indebted to defendant. Wells Fargo minimizes the unique attributes of a reverse mortgage that distinguish it from a typical loan. Defendant is not personally liable for any advances. Assuming no breach or relocation from the home, his repayment obligation arises only after his death. Finally, Wells Fargo is secured. As federal law states, the transaction enables an elderly homeowner to convert his or her home equity into a liquid asset. 12 *U.S.C.* § 1715z–20(a)(1). It is that asset that plaintiffs as judgment creditors are entitled to pursue.

Although we find that monthly reverse mortgage payments are subject to execution and garnishment, the court on remand must determine the percentage of the payments that will be subject to execution and garnishment, in accordance with the limitations set forth in *N.J.S.A.* 2A:17–56. *See Zavodnick v. Leven,* 340 *N.J.Super.* 94, 103, 773 *A.*2d 1170 (App.Div.2001).

■■ Turning to plaintiff's alternative request for relief, *N.J.S.A.* 2A:17–64 empowers a court to order a judgment debtor himself or herself "to make payments at stated periods in installments" from "rights and credits" due the debtor.

> If it is made to appear that the judgment debtor is entitled to, or is in receipt of, an income or any property or money or things in action, or *rights and credits,* including such income as is derived from federal, state, county, municipal or other governmental sources, but not income or property as is recovered or exempt by law, the Superior Court may direct the judgment debtor to make payments at stated periods in installments, and upon such terms and conditions as the court may direct, out of the same, on account of the unsatisfied judgment.
>
> [*N.J.S.A.* 2A:17–64 (emphasis added).]

The trial court determined plaintiffs were not entitled to relief under *N.J.S.A.* 2A:17–64 because the reverse mortgage payments to defendant were not "income" under the statute. However, as we have decided, the payments are nonetheless debts. Therefore, they qualify as "rights and credits." *See N.J.S.A.* 2A:17–57 (defining "rights and credits" to include among other things "debts").

■ An order under *N.J.S.A.* 2A:17–64 is directed at the judgment debtor. *Household Finance Corp. v. Clevenger,* 141 *N.J.Super.* 53, 55–56, 357 *A.*2d 279 (App.Div.1976). The remedy pre-existed the adoption of the statute authorizing garnishment of wages and debts. *Id.* at 56, 357 *A.*2d 279. The statutes must nonetheless be read together. *Id.* at 57–68, 357 *A.*2d 279. Thus, an order to pay in installments under *N.J.S.A.* 2A:17–64 is subject to the percentage limitations found in *N.J.S.A.* 2A:17–56. *Id.* at 58, 357 *A.*2d 279. The court may exercise its discretion in determining the "terms and conditions" governing the judgment debtor's installment payment obligation. Finally, the court may not order both a garnishment order and an installment order under *N.J.S.A.* 2A:17–64. *Id.* at 58, 357 *A.*2d 279. We presume plaintiffs prefer an order providing for garnishment, compelling payment by Wells Fargo, to which it is entitled.

Reversed and remanded for further proceedings consistent with this opinion. We do not retain jurisdiction.